# Supreme Court of Texas

No. 23-0704

Chad Seward, Home Depot U.S.A., Inc., and
Point 2 Point Global Security, Inc.,

*Petitioners*,

v.

Rogelio Santander Sr. and Julia Garcia, Individually and as
Co-Administrators of the Estate of Rogelio Santander Jr., and
Crystal Almeida,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued December 5, 2024**

JUSTICE DEVINE delivered the opinion of the Court.

JUSTICE BUSBY filed a concurring opinion, in which Justice Lehrmann joined.

This wrongful-death, survival, and personal-injury action arises out of the harrowing shooting of two police officers at a retail store. A detained suspected shoplifter with an outstanding arrest warrant killed one officer and injured the other when they attempted to arrest him at

the request of an off-duty officer employed as the retailer's security guard. The decedent's parents and the injured officer sued those involved, including the security guard and the retailer. On appeal, we are presented with two main issues: (1) whether the security guard's conduct leading up to the shooting was within the scope of his employment as a police officer, entitling him to dismissal of the suit against him under the Tort Claims Act;[1] and (2) whether we should adopt a common-law rule that limits the duties owed to responding public-safety officers.

We answer yes to both questions. First, when a police officer has reasonable suspicion that a person in his presence is about to commit or is in the process of committing theft, as here, he has a statutory duty to interfere to prevent the crime, even when off duty and in private employment.[2] And conduct that is objectively "in or about the performance" of that duty is within the scope of the officer's governmental employment.[3] Second, consistent with public policy, we join a majority of jurisdictions in adopting the public-safety officer's rule, which restricts the duties owed to officers who are injured by the alleged negligence that necessitated their response.[4] Among other policy

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 101.106(f); *Garza v. Harrison*, 574 S.W.3d 389, 393-94 (Tex. 2019) ("[Section 101.106(f)] effectively mandate[s] that only a governmental unit can be sued for a governmental employee's work-related tortious conduct.").

[2] TEX. CODE CRIM. PROC. art. 6.06; *Garza*, 574 S.W.3d at 403.

[3] TEX. CIV. PRAC. & REM. CODE § 101.001(5).

[4] *See infra* note 90. Originally known as the "fireman's rule" or "firefighter's rule," jurisdictions also refer to the doctrine or a variant of it as

considerations, the rule encourages the public to call public-safety officers, without hesitation or fear of liability, to address risks that are best dealt with by those who have the proper training, skills, and expertise. Applying these holdings, we reverse the court of appeals' judgment and reinstate the trial court's judgment dismissing the claims against the security guard and granting summary judgment in favor of the other defendants.

## I. Background

On April 24, 2018, Dallas Police Officer Chad Seward was working as a security guard in police uniform at a Home Depot store in Dallas. Home Depot had contracted with the private security vendor Point 2 Point Global Security, Inc. to provide officers, such as Seward, for security-guard work. The Dallas Police Department approved Seward's off-duty work, and under its general orders, officers "performing off-duty security . . . are subject to the same on-duty rules and regulations" as if "they were performing on-duty service."[5] Those rules require that they "take immediate action to protect life and property" and "respond to crimes in progress," consistent with statutory obligations.[6] But off-duty officers shall not (1) "[e]nforce company

---

the "professional rescuers doctrine" or "public-safety officer's rule." *Ellinwood v. Cohen*, 87 A.3d 1054, 1058 & n.4 (R.I. 2014). Although the parties here refer to the "firefighter's rule," the moniker "public-safety officer's rule" best encapsulates the rule we adopt today, and we use that nomenclature throughout the opinion.

[5] DALL. POLICE DEP'T, *General Order: Off-Duty Employment* § 421.03(J)(2) (2014).

[6] *Id.* § 421.03(A)(1); *see* TEX. CODE CRIM. PROC. art. 6.06.

3

policies or *house rules* unless the enforcement would constitute a law enforcement activity," (2) "[r]emain present" when a "private individual is conducting either a civil or criminal investigation," or (3) "[a]ssist in an investigation" by a "private individual."[7]

While monitoring the front of the store, Seward received a cellphone call from Scott Painter, a Home Depot asset-protection specialist. Painter described a customer who he believed was shoplifting. The suspect was suspiciously concealing store items inside a Home Depot bucket with the lid on it and ostensibly "getting ready to take it somewhere to steal it."[8] Seward trusted Painter as reliable and could see the suspect, Armando Juarez, walking around with the bucket.

Juarez next went into a back section of the store with "a big gap of empty space behind the insulation" and started taking items out of the bucket. But he then "concealed himself behind the insulation." Having "lost visual" before Juarez left the store, Painter could not apprehend him for shoplifting under Home Depot's policy.[9] So he told Seward, "I've got this guy. He's in the process right now of stealing. It's $30 worth of stuff. . . . All I want to do is give this guy a criminal

---

[7] DALL. POLICE DEP'T, *supra* note 5, § 421.03(J)(1).

[8] Painter later explained that contractors normally just need the bucket and do not take the lids. The suspect, however, "quickly grabbed three painters' shirts," another small item, and a carpentry knife and "put them inside of the bucket" with the lid on "to close the bucket," which was "very unnormal behavior" and "[i]ndicative of an intent to shoplift."

[9] A Multi-Store Asset Protection Manager explained that Home Depot's policy requires personnel, before stopping a suspect, to (1) observe the suspect select and conceal the merchandise, (2) maintain "constant observation," and (3) wait until the suspect had passed "the last point of sale or [is] exiting the store."

4

trespass [warning], we'll take—let him go and get the—the products will be recovered." A criminal-trespass warning is a statutorily authorized means for an owner to prevent an unwanted person from remaining on the property.[10]

Seward replied he was on his way, recognizing that Juarez had "brought merchandise into an area that no reasonable person would . . . take merchandise" and that Painter wanted him to give the warning "before [Juarez] had a chance to actually commit the theft that [Painter] suspected him of doing."[11] When Seward arrived at the back, he was joined by Elijah Lateef, another contract security guard. At that point, they saw Juarez "hiding inside one of the racks by the insulation" and asked what he was doing there. He replied that he was trying to scare his girlfriend and emerged without the bucket, which either Lateef or Painter subsequently secured. Painter then told Juarez to come to his office so they could issue the criminal-trespass warning and "you'll be on your way."

---

[10] *See* TEX. PENAL CODE § 30.05. Remaining on the property after receiving the warning is a misdemeanor offense. *Id.* § 30.05(d). Although a warning may be given by "the owner or someone with apparent authority to act for the owner," *id.* § 30.05(b)(2)(A), Painter thought he "would have to have police involved to be able to issue" one. Under the police department's procedures, an officer who "witness[es] the owner or representative of a property tell a person to leave the property" must "document a Criminal Trespass Warning" and "make an arrest if after being told to leave the property, the suspect refuses to do so." DALL. POLICE DEP'T, *Standard Operating Procedure: Criminal Trespass* § 1512(B) (2010). Documentation requires completing a report with identifying information and checking for any outstanding warrants. *Id.* § 1512(C).

[11] Seward explained that "[i]f you remove [the information] I was conveyed" by Painter, "I didn't see [Juarez] do anything that would tell me he committed a crime. I was only acting on what I was being told by Painter."

As they were walking, Seward grabbed Juarez's arm, exclaiming to the others that there is "Mace on his belt loop," and Juarez fell to his knees and ultimately into a fetal position. Juarez was asked if he had anything in his pockets, and when he responded affirmatively, the can of mace and his wallet were confiscated. Juarez then gave Seward permission to go through his wallet, which contained a thin card-shaped piece of metal with a blade diagonally across it. The mace, the blade, and the fact that they were "going to an area where we're going to be confined" prompted Seward to conduct a protective frisk. But because he was not arresting Juarez, Seward frisked only the outer clothing, feeling "unidentifiable objects" in the pockets but nothing like a weapon.[12] However, Painter, who was walking in the front of the group, testified that he never observed Juarez getting searched.

Seward averred that right after the mace was removed, he did a warrant check using a name and birth date Juarez had given him. Although the radio transmission was fuzzy from bad reception in the store, Seward heard dispatch identifying a "soundalike name" on a warrant. As a result, he called for a squad car to verify Juarez's identity

---

[12] The police department's general orders permit officers to conduct a nonconsensual protective frisk for officer safety, as authorized by *Terry v. Ohio*, 392 U.S. 1 (1968). DALL. POLICE DEP'T, *General Order: Consensual and Non-Consensual Search Procedures* §§ 330.01(F), .08(B)(8) (2015); *see Balentine v. State*, 71 S.W.3d 763, 769 (Tex. Crim. App. 2002) ("Law enforcement personnel may conduct a limited search for weapons of a suspect's outer clothing, even in the absence of probable cause, where an officer reasonably believes that the suspect is armed and dangerous to the officer or others in the area.").

and the warrant.[13]   Because Juarez was "very compliant and submissive" and Painter was just giving a warning "to deescalate the situation and calm him down," Seward saw no need for handcuffs and informed Juarez that he was not under arrest.

Once at the office, Painter instructed Juarez to sit down. Lateef left after setting down the bucket and wallet, which contained only a couple of coins. Seward asked Juarez how he was going to pay for the items, but he did not respond. Although Lateef and Seward testified that the wallet contained no identifying information, Painter recollected that Seward saw Juarez's identification, called dispatch for a warrant check, and requested backup all while in the office, not out on the floor.

After being informed that an off-duty officer was requesting assistance, Officers Rogelio Santander Jr. and Crystal Almeida were dispatched to the store. En route, they ran a warrant check with Juarez's name, which came up positive with a photo. On arriving, Almeida asked, "Hey, what did this guy do? He has a warrant." Seward replied "Okay" and requested their car keys to verify the warrant, which the officers provided with no other communication. By then, Almeida noticed that Juarez was unrestrained. But she chose not to handcuff

---

[13] *See* DALL. POLICE DEP'T, *General Order: Arrests Requiring Special Handling* § 315.02 (2017) (noting that a "hit indicat[ing] a warrant has been issued" is "alone not probable cause" and that "sufficient identifiers" should be compared to verify that the warrant names the same person in the officer's custody). Seward stated that even if Juarez was not that person, the squad car's computer would still be needed to issue the criminal-trespass warning "that entails writing a report," consistent with the police department's procedure. *See* DALL. POLICE DEP'T, *supra* note 10, § 1512(C).

him even though there was a possible warrant. Meanwhile, Painter did paperwork without talking to the officers.

At the patrol car, Seward saw Juarez's warrant information and matching picture. Because he was having radio transmission issues in the store, Seward called Painter and told him to let the officers know to "hook [Juarez] up, arrest him." When Painter relayed the message, Juarez asked, "So I'm going to jail?" Painter responded "yes." As Almeida moved towards Juarez, he stood up, pulled a gun from his right pocket, and shot both officers and Painter before running out of the room. Santander passed away the next morning, Almeida sustained traumatic brain injury and partial loss of vision and hearing, and Painter was injured from a bullet going through his nose and into his shoulder. Juarez ultimately pleaded guilty to capital murder of a peace officer and received a life sentence without parole.

## II. Procedural History

Santander's parents and Almeida (collectively, the plaintiffs) sued Seward, Point 2 Point, and Home Depot, seeking recovery for wrongful death, survival, and personal injuries under various negligence and vicarious-liability theories.[14] Their live petition focuses

---

[14] The plaintiffs sued Seward for negligence and negligent undertaking and Point 2 Point and Home Depot for negligence, negligent undertaking, negligent training and supervision, and vicarious liability based on Seward's, Painter's, and Lateef's conduct under respondeat superior, joint-venture, and agency theories. They also sued Juarez, Lateef, and Lateef's security vendor, but those claims are not at issue in this appeal. The plaintiffs nonsuited their claims against Lateef and his vendor, and the trial court severed the remaining claims from the claims against Juarez. Finally, the plaintiffs do not challenge the portion of the court of appeals' judgment that affirmed the summary

8

on (1) Home Depot's policies that allowed its personnel to confront suspected shoplifters but prohibited physically searching or handcuffing detained suspects (a "no touch" policy) and (2) Painter's and Seward's alleged negligence in (i) failing to adequately search, restrain, disarm, and supervise Juarez; (ii) increasing the risk of violent resistance by searching Juarez, seizing his property, checking for warrants, and detaining him; and (iii) failing to warn Santander and Almeida that Juarez had not been adequately searched and disarmed.

Seward moved for dismissal under the Tort Claims Act's election-of-remedies provision, which provides that certain tort suits against a governmental employee based on conduct within the "general scope of that employee's employment" shall be dismissed.[15] Seward asserted he was acting as a police officer, notwithstanding his off-duty work, because he was responding to a reasonable suspicion that Juarez was committing or about to commit a crime. After considering the evidence, the trial court granted the motion.

Point 2 Point then filed a combined traditional and no-evidence summary-judgment motion, alleging it could not be liable for Seward's actions when his conduct was within the scope of his governmental employment. Home Depot filed a hybrid summary-judgment motion on the same ground, additionally asserting that (1) the common-law public-safety officer's rule restricts its duties owed to the police officers and (2) there is no evidence Home Depot or Painter breached the

---

judgment in Home Depot's favor on the vicarious-liability claims against it based on Lateef's conduct. 700 S.W.3d 126, 165 (Tex. App.—Dallas 2023).

[15] *See* TEX. CIV. PRAC. & REM. CODE § 101.106(f).

remaining duties owed.[16] The trial court granted both motions on the evidence submitted, and the plaintiffs appealed the final judgment.

In a fractured decision with three opinions, the court of appeals reversed and remanded in part.[17] As to Seward, the lead opinion concluded dismissal was improper.[18] The opinion reasoned that a jury could find Seward's conduct was outside the scope of his police-officer employment because he "was merely assisting a private employer in enforcing the employer's policies and in ejecting a potential trespasser" but only "up to the point he contacted dispatch to determine whether Juarez had any outstanding warrants."[19] On this issue, the lead opinion cobbled a majority judgment as the middle position between the other two divergent writings.[20] A concurring and dissenting opinion concluded Seward was acting in his private capacity up to, but also including, the warrant check because even then, he had "no police reason to contact

---

[16] Home Depot asserted other summary-judgment grounds, including: (1) the plaintiffs' negligence claims constitute improperly pleaded premises-liability claims to which the negligence standard cannot apply as a matter of law; (2) Seward's conduct as a governmental employee was the intervening, superseding cause of the injuries; (3) no evidence exists that Home Depot negligently undertook its asset-protection service for the protection of the responding police officers; and (4) no evidence supports that Home Depot is vicariously liable for Painter's, Seward's, or Lateef's actions.

[17] 700 S.W.3d at 164-65 (Garcia, J.); *see id.* at 165 (Carlyle, J., concurring and dissenting); *id.* at 169 (Rosenberg, J., dissenting).

[18] *Id.* at 164 (Garcia, J.).

[19] *Id.* at 146.

[20] *Id.* at 164-65 (describing the disposition "[i]n light of the separate opinions").

10

dispatch."[21] A dissenting opinion would have held that Seward's relevant conduct was entirely within the scope of his police-officer employment, explaining that the lead opinion "focuses on the facts relating to the criminal trespass warning rather than the evidence showing the reason for the warning—potential theft."[22] Because the court affirmed the dismissal of the claims against Seward that are based on his warrant check or subsequent conduct, it also affirmed the summary judgment on the claims against Point 2 Point and Home Depot to the extent those claims are based on that same conduct.[23]

As to the other claims against Home Depot, the court agreed that fact issues preclude summary judgment.[24] The lead opinion assumed the public-safety officer's rule applied and noted that Home Depot still had a duty to warn of known, dangerous conditions that were unknown to the responding officers.[25] Relying on Painter's testimony that he did not see Seward search Juarez, the opinion concluded that there was some evidence Home Depot knew Juarez had not been searched, which could constitute a dangerous condition, and provided no warning of it.[26]

---

[21] *Id.* at 167-69 (Carlyle, J., concurring and dissenting).

[22] *Id.* at 171 (Rosenberg, J., dissenting).

[23] *Id.* at 151-53, 165 (Garcia, J.) (citing *Ogg v. Dillard's, Inc.*, 239 S.W.3d 409, 418 (Tex. App.—Dallas 2007, pet. denied), and *Leake v. Half Price Books, Recs., Mags., Inc.*, 918 S.W.2d 559, 564 (Tex. App.—Dallas 1996, no writ)).

[24] *Id.* at 165.

[25] *Id.* at 156-57.

[26] *Id.* at 157-58 & n.5. The court of appeals also rejected Home Depot's arguments supporting its other summary-judgment grounds. *See id.* at 153-55, 158-65; *supra* note 16.

11

Seward and Point 2 Point petitioned for review, challenging the court of appeals' holding that a fact issue exists on whether Seward's conduct before the warrant check was within the scope of his governmental employment. In a separate petition for review, Home Depot argues that (1) the public-safety officer's rule should be adopted and applies here, (2) a retailer owes no duty to warn responding officers that a detained suspect has not been searched when it is unknown that the suspect possesses a concealed weapon, and (3) it is not vicariously liable for Seward's conduct as a police officer.[27] We granted both petitions for review.

## III. Discussion

A governmental employee's motion that invokes the right to dismissal under the Tort Claims Act's election-of-remedies provision is, in effect, an assertion of governmental immunity.[28] Our review of a ruling on such a motion, including the proper construction and application of the statutory provision, is de novo.[29] Likewise, we review de novo a ruling on a hybrid summary-judgment motion.[30] When both

---

[27] Because we conclude that these issues are dispositive, we do not reach Home Depot's issues that address its alternative summary-judgment grounds.

[28] *Garza v. Harrison*, 574 S.W.3d 389, 400 n.43 (Tex. 2019) (citing *Marino v. Lenoir*, 526 S.W.3d 403, 405 & n.5 (Tex. 2017)); *see Alexander v. Walker*, 435 S.W.3d 789, 791 (Tex. 2014) (noting that a suit that is eligible for dismissal under section 101.106(f) "actually seeks to impose liability against the governmental unit rather than on the individual specifically named" and is against that unit "in all but name only" (quoting *Tex. Adjutant Gen.'s Off. v. Ngakoue*, 408 S.W.3d 350, 356-57 (Tex. 2013))).

[29] *Garza*, 574 S.W.3d at 400.

[30] *Fossil Grp., Inc. v. Harris*, 691 S.W.3d 874, 882 (Tex. 2024).

parties present evidence on these types of motions, as here, the standards of review mirror each other.[31] The ultimate question is whether an issue of material fact precludes dismissal or summary judgment.[32] To answer that question, "[w]e examine the evidence in the light most favorable to the nonmovant, indulging reasonable inferences and resolving any doubts against the moving party."[33]

We consider each of the trial court's rulings in turn.

## A. General Scope of a Police Officer's Employment

We first address whether Seward is entitled to dismissal under the Tort Claims Act. In doing so, we describe how section 101.106(f)—the election-of-remedies provision—relates to police officers, who are "relatively unique among governmental employees."[34] We then consider whether that provision governs here. We conclude it does because Seward's conduct was within the general scope of his police-officer employment. The court of appeals erred in holding otherwise, and Seward is entitled to have the suit against him dismissed.

### 1.

Under section 101.106(f), a governmental employee may move to dismiss a suit that is "considered to be against the employee in the employee's official capacity only."[35] To qualify as such, the suit must be one that (1) is "based on conduct within the general scope of that

---

[31] *City of Austin v. Powell*, 704 S.W.3d 437, 448 (Tex. 2024).

[32] *Id.*; *Marino*, 526 S.W.3d at 405.

[33] *Fossil Grp.*, 691 S.W.3d at 882.

[34] *Garza*, 574 S.W.3d at 403.

[35] TEX. CIV. PRAC. & REM. CODE § 101.106(f).

employee's employment" and (2) "could have been brought under this chapter against the governmental unit."[36]  If so, the suit "shall be dismissed," but the plaintiff may amend the pleadings to name the unit as defendant.[37]  Section 101.106(f) compels a plaintiff to "decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable."[38]  At its core, the provision "favors the expedient dismissal of governmental employees when suit should have been brought against the government."[39]

The parties disagree on whether Seward's conduct was within the scope of his employment as a Dallas Police Officer.[40]  The Tort Claims Act broadly defines "scope of employment" to mean (1) "the performance for a governmental unit of the duties of an employee's office or employment," including (2) "being in or about the performance of a task lawfully assigned to an employee by competent authority."[41]  Simply put,

---

[36] *Id.*

[37] *Id.*  The governmental unit may still be protected by immunity from suit, even if its employee is entitled to dismissal under this section.  *Franka v. Velasquez*, 332 S.W.3d 367, 385 (Tex. 2011).

[38] *Garza*, 574 S.W.3d at 399 (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008)).

[39] *Id.* (quoting *Tex. Adjutant Gen.'s Off. v. Ngakoue*, 408 S.W.3d 350, 355 (Tex. 2013)).

[40] It is undisputed that Seward was an employee of a governmental unit, *see* TEX. CIV. PRAC. & REM. CODE § 101.001(2), (3), and that the plaintiffs' suit against Seward "could have been brought" under the Act against that unit for the purposes of section 101.106(f), *see Franka*, 332 S.W.3d at 385.

[41] TEX. CIV. PRAC. & REM. CODE § 101.001(5).

14

the inquiry is whether there is "a connection between the employee's job duties and the alleged tortious conduct."[42]  Because the analysis objectively assesses conduct, the officer's "state of mind, motives, and competency are irrelevant."[43]  Conduct is outside the scope of employment when it occurs "within an independent course of conduct not intended by the employee to serve *any* purposes of the employer."[44]

For most governmental employees, the inquiry is usually straightforward.  But the analysis is frequently more complicated for peace officers, which includes police officers like Seward.[45]  This complexity may arise because police officers "retain their status as peace officers twenty-four hours a day," are "expected to stop crime *whenever* it occurs," and are "relatively unique among governmental employees as they may be required to spring into action at a moment's notice."[46]

---

[42] *Laverie v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017).

[43] *Garza*, 574 S.W.3d at 400-01.

[44] *Id.* at 400 (quoting *Alexander v. Walker*, 435 S.W.3d 789, 792 (Tex. 2014)).  The use of "intended" does not incorporate a subjective analysis; it "simply reflect[s] that an employee whose conduct is unrelated to his job, and therefore objectively outside the scope of his employment, is engaging in that conduct for his own reasons."  *Laverie*, 517 S.W.3d at 753-54.

[45] TEX. CODE CRIM. PROC. art. 2A.001(3) (designating "police officer[s] of a municipality" as "peace officers").  In 2023, the Legislature enacted nonsubstantive revisions of the Code of Criminal Procedure by moving certain articles to new chapters, including those related to the powers and duties of peace officers.  *See* Act of May 17, 2023, 88th Leg., R.S., ch. 765, § 1.001, 2023 Tex. Gen. Laws 1837-1931 (codified at TEX. CODE CRIM. PROC. chs. 2A, 2B, 13A, 45A, and 55A).  For convenience, we cite to the current version of the Code.

[46] *Garza*, 574 S.W.3d at 403 (internal quotation marks omitted).

15

As relevant here, for example, article 6.06 of the Code of Criminal Procedure states, "Whenever, in the presence of a peace officer, or within his view, one person is about to commit an offense against the . . . property of another . . . it is his duty to prevent it[.]"[47] Article 2A.051(2) reaffirms this duty: "Each peace officer shall . . . in every case authorized by this code, interfere without warrant to prevent or suppress crime[.]"[48] And as noted above, the Dallas Police Department general orders require its off-duty officers to "respond to crimes in progress."

Peace officers also commonly engage in off-duty security work, and this private employment further compounds the analysis. For such scenarios, we have identified "helpful guidelines," as described in *Garza*:

> An officer enforcing general laws in accordance with a statutory grant of authority is acting in the course and scope of employment as a peace officer. But if an officer is protecting a private employer's property, ejecting trespassers, or enforcing rules and regulations promulgated by the private employer, a fact question *may* arise as to whether the officer's conduct is in a private or official capacity.[49]

Because these are guidelines, none of the referenced conduct is categorically dispositive, and any inquiry must unfailingly return to whether the conduct is encompassed within the textual meaning of the

---

[47] TEX. CODE CRIM. PROC. art. 6.06.

[48] *Id.* art. 2A.051(2); *see* TEX. GOV'T CODE § 311.016(2) ("'Shall' imposes a duty.").

[49] 574 S.W.3d at 403 (emphasis added) (footnote omitted).

Act's scope-of-employment definition.[50] In some instances, protecting private property, ejecting trespassers, or enforcing house rules may not implicate the performance of a peace officer's official duties, and a fact issue "may" arise as to that question depending on the context of the officer's conduct. In other circumstances, such conduct might be either "the performance for a governmental unit of the duties of an employee's office or employment" or "in or about the performance of a task lawfully assigned to an employee by competent authority" as a matter of law, bringing it within the course and scope of a peace officer's official duties.[51]

With this law in mind, we turn to the parties' dispute.

**2.**

Drawing on the *Garza* guidelines, the plaintiffs contend that prior to the warrant check, Seward was merely protecting Home Depot property and enforcing house rules by issuing a criminal-trespass warning at Painter's direction. Seward counters that he was performing his peace-officer duties from the time he encountered Juarez because he was responding to a reasonable suspicion of a theft in progress or about to be committed. According to Seward, the police department's general orders and the Code of Criminal Procedure obliged him to respond in that scenario, even when off duty, to prevent or suppress the theft. We agree.

---

[50] *See Bexar Appraisal Dist. v. Johnson*, 691 S.W.3d 844, 847 (Tex. 2024) (noting that when the Legislature has supplied a statutory definition of a term, we are bound to follow that meaning); *Ford Motor Co. v. Parks*, 691 S.W.3d 475, 482 n.36 (Tex. 2024) (acknowledging that we are a "text-centric court").

[51] TEX. CIV. PRAC. & REM. CODE § 101.001(5).

17

Theft occurs if a person "unlawfully appropriates property with intent to deprive the owner of property."[52] And "reasonable suspicion" is an objective standard that disregards the officer's "actual subjective intent."[53] In other words, reasonable suspicion exists if "the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaged in criminal activity."[54]

From Painter's cellphone call, Seward acquired specific articulable facts that Juarez had suspiciously concealed store items worth about $30 in a bucket with the lid on it and was in an area no reasonable person would take merchandise. When Seward encountered Juarez hiding inside a store rack with a dubious explanation that he was trying to scare his girlfriend, Painter's description was further corroborated.[55] The rational inferences from these facts would lead any officer to reasonably suspect that Juarez was in the process of or about to be engaged in shoplifting—that is, theft.

---

[52] TEX. PENAL CODE § 31.03(a).

[53] *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).

[54] *State v. Cortez*, 543 S.W.3d 198, 204 (Tex. Crim. App. 2018) (quoting *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015)).

[55] *Cf. D.C. v. Wesby*, 583 U.S. 48, 59 (2018) (holding that for purposes of probable cause, officers could reasonably infer from the suspects' vague and implausible stories that they were lying and that those lies indicated a guilty mind); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").

As a result, Seward objectively had "reasonable suspicion" a specific offense against property was afoot.[56] The plaintiffs disagree, alleging that (1) Seward had not *witnessed* anything suggesting Juarez was shoplifting and (2) Juarez had not exited the store without paying for the merchandise. But neither is required. "[C]itizen informants who identify themselves," like Painter, "are considered inherently reliable" for establishing reasonable suspicion.[57] And a customer can "exercise control over [and appropriate] property with an intent to deprive, even if the customer has not yet left the store with the property."[58]

With this suspicion, Seward was tasked under the police department's general orders and articles 2A.051(2) and 6.06 of the Code of Criminal Procedure with a duty to "respond to" and "prevent or suppress" the offense of theft by a person in his presence.[59] As

---

[56] We need not decide whether the suspicion rose to probable cause for an arrest. Nevertheless, our sister court has held that probable cause, which requires a "greater level of suspicion than 'reasonable suspicion,'" existed in similar circumstances. *State v. Ford*, 537 S.W.3d 19, 20-23, 25 n.26, 26 (Tex. Crim. App. 2017).

[57] *Id.* at 26 (internal quotation marks omitted).

[58] *Id.* at 24. Although Home Depot's policy required that a suspect pass the last point of sale before apprehension, *see supra* note 9, that policy has no role in dictating either the statutory elements for theft or what constitutes reasonable suspicion for a police officer.

[59] *See* TEX. CODE CRIM. PROC. arts. 2A.051(2), 6.06; DALL. POLICE DEP'T, *supra* note 5, § 421.03(A)(1); *see also CKJ Trucking, L.P. v. City of Honey Grove*, 581 S.W.3d 870, 877 (Tex. App.—Dallas 2019, pet. denied) (noting that an officer's public duty can be triggered by reasonable suspicion even without witnessing a crime); *Ogg v. Dillard's, Inc.*, 239 S.W.3d 409, 419-20 (Tex. App.—Dallas 2007, pet. denied) (same). Article 6.06's disjunctive language—"in the presence of a peace officer, *or* within his view"—indicates that an officer need not see the crime for the duty to be triggered. TEX. CODE CRIM. PROC. art. 6.06

19

statutorily defined, the term "scope of employment" would encompass the "performance" of that duty, as it is a "dut[y] of [Seward]'s office" as a peace officer.[60] And the conduct of issuing a criminal-trespass warning, when objectively viewed and under these circumstances, constitutes performing that duty. As Painter explained in his call to Seward, issuing a warning would lead to the recovery of the merchandise and the removal of Juarez from the property, thereby preventing or suppressing the criminal activity of which Seward had reasonable suspicion.[61]

The plaintiffs allege that Seward nevertheless acted outside the scope of what the police department's general orders authorize by assisting in or remaining present for an investigation conducted by a private individual.[62] But when Painter requested Seward's presence, his shoplifting investigation had concluded. He had lost visual contact

(emphasis added). And as we referenced in *Garza v. Harrison*, our sister court has interpreted similar "within the officer's presence or view" language from another article to mean "that an officer need not personally observe the offense so long as the officer has personal knowledge of facts providing the officer probable cause to believe an offense was occurring or had occurred." 574 S.W.3d 389, 402 n.62 (Tex. 2019) (citing TEX. CODE CRIM. PROC. art. 14.03, and *Brother v. State*, 166 S.W.3d 255, 257, 260 (Tex. Crim. App. 2005)).

[60] *See* TEX. CIV. PRAC. & REM. CODE § 101.001(5).

[61] An officer's duty to respond to, prevent, or suppress criminal activity does not necessarily require an arrest. For example, article 6.06 neither requires nor independently authorizes an arrest to prevent the offense. *See* TEX. CODE CRIM. PROC. arts. 6.06 (peace officers' duty to prevent an offense), 6.07 (preventing an offense is regulated by the same rules "as are prescribed to the action of the person about to be injured"); *Heath v. Boyd*, 175 S.W.2d 214, 217 (Tex. 1943) (noting that the nearly identical predecessor to article 6.06 does not require or authorize an arrest).

[62] *See* DALL. POLICE DEP'T, *supra* note 5, § 421.03(J)(1).

20

and could no longer apprehend Juarez under Home Depot's policy.[63] At that point, Painter merely wanted a criminal-trespass warning issued.[64]

The plaintiffs also contend that because Painter directed the actions, Seward's conduct could not be within the scope of his governmental employment. But Home Depot and Painter had no right to control Seward's performance of his statutory duties, even when he was off duty. If Seward's employment contract gave them that power, "grave public-policy concerns would be implicated" because this would imply "that peace officers can contractually avoid their oaths of office."[65] Thus, even if an off-duty officer acts consistent with his private employer's directions while performing his peace-officer duties, as Seward did here, "co-existing motivations do not remove an employee's actions from the scope of his [governmental] employment so long as the conduct serves a purpose of the [governmental] employer."[66]

We therefore hold that Seward established as a matter of law that his conduct in issuing a criminal-trespass warning was "the

---

[63] *See supra* note 9. And even if Seward's conduct could be construed as enforcing house rules, the performance of a peace officer's statutory duty would be law-enforcement activity, which the general orders expressly authorize. DALL. POLICE DEP'T, *supra* note 5, § 421.03(J)(1) (prohibiting the enforcement of house rules unless it "would constitute a law enforcement activity").

[64] Although Painter, as an authorized representative of the property owner, could independently issue the warning, *see* TEX. PENAL CODE § 30.05, "[w]hether a private citizen could effect [a certain action] does not preclude [that] action from falling within the ambit of a peace officer's job responsibilities," *Garza*, 574 S.W.3d at 404 n.75.

[65] *Garza*, 574 S.W.3d at 405 (citing TEX. CONST. art. XVI, § 1).

[66] *Id.* at 404 n.74 (quoting *Kraidieh v. Nudelman*, No. 01-15-01001-CV, 2016 WL 6277409, at *6 (Tex. App.—Houston [1st Dist.] Oct. 27, 2016, no pet.)).

21

performance for a governmental unit of the duties of [his] office or employment" as a peace officer.[67]  Objectively, Seward was doing his job and performing his peace-officer duties to prevent or suppress a specific offense against property that he had reasonable suspicion a person in his presence was committing or about to commit.[68]  In other words, his conduct did not occur "within an independent course of conduct not intended by the employee to serve *any* purposes of the [governmental] employer."[69]

To avoid dismissal, then, the plaintiffs had to raise a fact issue that some other alleged negligent conduct before the warrant check was not "in or about the performance" of Seward's duties as a peace officer.[70]  They did not.  The plaintiffs home in on and question the adequacy— and the occurrence—of Seward's protective frisk.  But the parties do not dispute that the frisk, to the extent it occurred, was in response to finding the mace and blade on Juarez.[71]  This, combined with his

---

[67] *See* TEX. CIV. PRAC. & REM. CODE § 101.001(5).

[68] Although it is the Legislature's prerogative to impose duties on off-duty peace officers, the decision to do so makes sense as a policy matter in this context.  Off-duty officers often wear their uniform when employed as security guards, as Seward was doing, and are acting in view of the public who expect them to respond when there is reasonable suspicion of crimes either in progress or about to be committed in that officer's presence.

[69] *Garza*, 574 S.W.3d at 400 (internal quotation marks omitted).

[70] *See* TEX. CIV. PRAC. & REM. CODE § 101.001(5).

[71] *See Lerma v. State*, 543 S.W.3d 184, 192 (Tex. Crim. App. 2018) (holding that an officer had reasonable suspicion to conduct a protective frisk after having removed a belt knife because the suspect "could have possessed additional weapons on his person; the need to discover weapons did not disappear once the person removed the obvious weapon").

suspicious behavior and the knowledge that they soon would be in a confined space, provided Seward with the authorization as a police officer to frisk Juarez, which Home Depot's "no touch" policy otherwise prohibited him from doing.[72] If the frisk occurred, it would be conduct within the scope of Seward's governmental employment while he was "in or about" responding to the reasonable suspicion of a theft occurring in his presence. And even if the frisk was "performed wrongly or negligently, the inquiry is satisfied if, when viewed objectively, 'a connection [exists] between the employee's job duties and the alleged tortious conduct.'"[73]

For these reasons, the suit against Seward is considered to be against him in his official capacity only and must be dismissed under section 101.106(f).[74] The trial court properly granted Seward's motion to dismiss, and the court of appeals erred to the extent it reversed that portion of the judgment.[75]

---

[72] *See id.* at 191 (holding that a pat-down is justified if the officer has "specific and articulable facts" that lead him to reasonably believe the suspect is armed and dangerous); *supra* note 12 & accompanying text.

[73] *Garza*, 574 S.W.3d at 394 (quoting *Laverie v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017)). The plaintiffs' petition is unclear about whether they allege Seward negligently detained Juarez *before* the warrant check, and Seward stated that he detained Juarez once a soundalike warrant came back. To the extent the plaintiffs allege a detention occurred before the warrant check, a warrantless detention may be justified by reasonable suspicion that "the person detained is, has been, or soon will be engaged in criminal activity." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).

[74] *See* TEX. CIV. PRAC. & REM. CODE § 101.106(f).

[75] 700 S.W.3d 126, 150-51, 164-65 (Tex. App.—Dallas 2023) (Garcia, J.).

Our holding also disposes of the claims predicated on Seward's conduct: those against Point 2 Point and some of the vicarious-liability claims against Home Depot. Both the trial court and the court of appeals concluded summary judgment was proper on those claims to the extent Seward was acting within the scope of his governmental employment, although they disagreed on which conduct was covered.[76] In this Court, the plaintiffs do not challenge those rulings and concede that whether a private employer can be held liable for an off-duty officer's conduct as a police officer "is simply not an issue presently before the Court." We therefore express no opinion on the merits of this issue. And because we agree with the trial court as to when Seward was acting within the scope of his peace-officer employment, we reinstate the summary judgment on those claims.

## B. The Public-Safety Officer's Rule

We now address whether summary judgment was proper on the remaining claims against Home Depot for negligence and vicarious liability based on Painter's conduct. These claims turn on the existence and parameters of the duties Home Depot owed to Almeida and Santander, a threshold question of law in a negligence case.[77] As a matter of first impression, we consider whether to adopt the public-safety officer's rule, which restricts the duties owed to responding

---

[76] *Id.* at 151-53, 165; *see id.* at 153 n.3 (holding that the plaintiffs failed to cite authority and waived their argument that "it is contrary to public policy to hold that Point 2 Point and Home Depot are not liable for Seward's conduct under these facts").

[77] *See HNMC, Inc. v. Chan*, 683 S.W.3d 373, 380 (Tex. 2024); *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 638 (Tex. 2023).

officers. Concluding that public policy supports the rule's adoption in Texas, we apply it here. Because the plaintiffs did not raise a fact issue that Home Depot breached its remaining duties, the trial court properly granted a take-nothing summary judgment on these claims.

## 1.

We begin with the historical background for the public-safety officer's rule. In the late nineteenth century, the Supreme Court of Illinois formulated a common-law rule by classifying firefighters as "mere naked licensee[s]," rather than invitees, when they entered the premises as a matter of legal right to extinguish a fire.[78] As a result of this status, the property owner assumed no duties toward firefighters "except that he will refrain from willful or affirmative acts which are injurious."[79] Originally known as the "fireman's rule," it garnered nearly unanimous acceptance and was adopted across jurisdictions,[80]

---

[78] *Gibson v. Leonard*, 32 N.E. 182, 189-92 (Ill. 1892), *overruled in part by Dini v. Naiditch*, 170 N.E.2d 881 (Ill. 1960); *see Woodruff v. Bowen*, 34 N.E. 1113, 1117 (Ind. 1893) ("[T]he owner of a building in a populous city does not owe it as a duty, at common law, independent of any statute or ordinance, to keep such building safe for firemen, or other officers who in a contingency may enter the same under a license conferred by law."); *see also* David L. Strauss, *Where There's Smoke, There's the Firefighter's Rule: Containing the Conflagration after One Hundred Years*, 1992 WIS. L. REV. 2031, 2034-35 (1992) (describing the rule's history).

[79] *Gibson*, 32 N.E. at 189.

[80] *Walters v. Sloan*, 571 P.2d 609, 610-11 (Cal. 1977) (collecting early cases and noting that the "rule was born almost a century ago, earning nearly unanimous acceptance"); *see Moody v. Delta W., Inc.*, 38 P.3d 1139, 1140-42 (Alaska 2002) (discussing the rule's broad acceptance); *Aetna Cas. & Sur. Co. v. Vierra*, 619 A.2d 436, 437 (R.I. 1993) (same).

evolving to cover not only firefighters but also police officers and other public-safety officers.[81]

Over time, however, courts became disenchanted with grounding the rule in premises-liability categories as the rationale proved awkward and unsatisfactory. Firefighters and police officers discharging their public duties do not fit neatly into the traditional licensee category, but neither are they trespassers or invitees.[82] This is so because they enter the premises (1) as a matter of legal right rather

---

[81] *Apodaca v. Willmore*, 392 P.3d 529, 539 (Kan. 2017) ("In our sister jurisdictions that have adopted the firefighter's rule, approximately 25 have extended it to police officers and in many cases, other public safety officers."); *Martellucci v. Fed. Deposit Ins. Co.*, 748 A.2d 829, 830 n.1 (R.I. 2000) (noting that most jurisdictions now apply the rule to police officers and other public-safety officials); *Flowers v. Rock Creek Terrace Ltd. P'ship*, 520 A.2d 361, 366 n.4 (Md. 1987) (same). *But see, e.g.*, *Cole v. Hubanks*, 681 N.W.2d 147, 149, 154 (Wis. 2004) (declining to extend the rule to police officers).

[82] *See, e.g.*, *Flowers*, 520 A.2d at 367 ("Most [courts] have concluded that firemen do 'not fit comfortably within the traditional concepts' of landowner liability." (quoting *Krauth v. Geller*, 157 A.2d 129, 130 (N.J. 1960))); *Thomas v. Pang*, 811 P.2d 821, 823 (Haw. 1991) ("Difficulty arose when fire fighters were classified as invitees or licensees as they did not fit neatly in either category."); *Kreski v. Mod. Wholesale Elec. Supply Co.*, 415 N.W.2d 178, 181 (Mich. 1987) (noting that firefighters do not cleanly fit into licensee or invitee category); Strauss, *supra* note 78, at 2034-35 ("Most courts, however, became disenchanted with such a classification of firefighters because of the inherent difficulties of neatly fitting firefighters into a category of entrant."); Francis H. Bohlen, *The Duty of a Landowner Towards Those Entering His Premises of Their Own Right*, 69 U. PA. L. REV. 340, 344 (1921) (describing the difficulty of classifying officers entering premises by right). In Texas, an invitee "is one who enters the property of another with the owner's knowledge and for the mutual benefit of both"; a licensee "is a person who goes on the premises of another merely by permission, express or implied, and not by any express or implied invitation"; and a trespasser is one who enters another's property without express or implied permission. *Cath. Diocese of El Paso v. Porter*, 622 S.W.3d 824, 829 (Tex. 2021) (internal quotation marks omitted).

than based on permission, consent, or business invitation; and (2) for the benefit of the landowner and the public, not for their own purposes.[83] Courts also found the rationale incongruent when other public officials who had a legal right to enter the premises—for example, "postmen, water meter readers and revenue inspectors"—were judicially ascribed invitee status in contrast to firefighters and police officers.[84] Finally, some courts noted the fundamental unfairness of basing the rule on

[83] *See, e.g.*, *Pearson v. Can. Contracting Co.*, 349 S.E.2d 106, 110 (Va. 1986) ("Policemen and firemen . . . enter premises as of right, under a privilege based on a public purpose. They clearly are not trespassers. Nor can they be classified as licensees or invitees, who enter with consent or invitation of the occupant, as consent and invitation are irrelevant to a policeman's or fireman's privileged entry."); *Dini v. Naiditch*, 170 N.E.2d 881, 885 (Ill. 1960) (noting that the "legal fiction that firemen are licensees . . . is without any logical foundation," as it is "highly illogical to say that a fireman who enters the premises quite independently of either invitation or consent cannot be an invitee because there has been no invitation, but can be a licensee even though there has been no permission"); Strauss, *supra* note 78, at 2035 ("[B]ecause entry by a firefighter is actually by public right rather than by any type of permission, he or she cannot strictly be considered a licensee."). Some courts have classified police officers and firefighters as a sui generis category. *See Apodaca*, 392 P.3d at 535-36 (collecting cases classifying firefighters variously as licensees, invitees, or sui generis).

[84] *Dini*, 170 N.E.2d at 885 ("If benefit to the landowner is the decisive factor, it is difficult to perceive why a fireman is not entitled to that duty of care, or how the landowner derives a greater benefit from the visit of other public officials, such as postmen, water meter readers and revenue inspectors, than from the fireman who comes to prevent the destruction of his property."); *see Thomas*, 811 P.2d at 823 ("The Rule also failed to adequately explain the distinction in treating some public employees, such as postal workers and building inspectors, as invitees, while classifying fire fighters and police officers as licensees."); *Flowers*, 520 A.2d at 367 (describing how postal workers and building inspectors enter premises by legal right and noting that "[n]othing in traditional premises liability law, however, furnishes a ground for classifying some of these public employees as invitees and others as licensees").

27

entrant status and limiting "the rule's application to the landowner/occupant context, thus denying liability for negligent acts of these individuals but not for others whose negligent acts injure police officers or firemen elsewhere."[85] For these reasons, the modern trend has been to root the rule in public policy and extend it beyond the premises-liability context.[86]

---

[85] *Pottebaum v. Hinds*, 347 N.W.2d 642, 645 (Iowa 1984); *see, e.g.*, *Apodaca*, 392 P.3d at 541 ("A firefighter is prohibited from recovering based on the initial act of negligence regardless of whether the call is to a traffic accident or someone's home, to a fire or some other emergency."); *Court v. Grzelinski*, 379 N.E.2d 281, 286 (Ill. 1978) (Ryan, J., dissenting) (noting that it is "extremely illogical" that the rule "would not permit a fireman to recover for injuries he receives in extinguishing a fire in my automobile which I caused by negligently pouring gasoline on the hot manifold if the automobile is parked in my driveway, but that he would be permitted to recover if my automobile is parked in the street").

[86] *See Baldonado v. El Paso Nat. Gas Co.*, 176 P.3d 277, 280 (N.M. 2007) (noting that most modern decisions base the rule on public policy); *Fordham v. Oldroyd*, 171 P.3d 411, 413 (Utah 2007) (same); *Flowers*, 520 A.2d at 447 ("[T]he fireman's rule is best explained by public policy."); RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 32 (AM. L. INST. 2010) ("Under its modern incarnation, that rule is based on a mélange of public-policy considerations and dealt with under the rubric of duty."); RESTATEMENT (THIRD) OF TORTS: MISCELLANEOUS PROVISIONS § 5_0 reporters' note cmt. k (AM. L. INST., Tentative Draft No. 3, 2024) ("[A] strong majority of the courts that have adopted the firefighter's rule support its application to any actor whose tortious activity creates the need for the rescuer's presence."). *But see Dolsen v. VeoRide, Inc.*, 235 N.E.3d 1258, 1260 (Ind. 2024) (recognizing two distinct doctrines: a firefighter's rule that applies only to a firefighter's premises-liability claim and an expanded first-responder's rule that "limits the duty owed to all first responders during an emergency"); *Sepega v. DeLaura*, 167 A.3d 916, 919 (Conn. 2017) (declining to extend the rule "beyond claims of premises liability"); *Grzelinski*, 379 N.E.2d at 285 (same). As the doctrinal basis shifted away from premises-liability categories, some courts initially relied on assumption of risk. But this basis also largely fell out of favor as jurisdictions adopted comparative-negligence regimes. *Fordham*, 171 P.3d at

We have not previously considered whether to adopt a public-safety officer's rule.[87]  In 1996, the issue was presented to us in *Juhl v. Airington*, but we did not reach it.[88]  Justice Gonzalez, joined by Justice Abbott, wrote separately to advocate for adopting the rule consistent with the "trend in other jurisdictions to extend the Rule beyond premises liability based on public policy."[89]  We do so now,

---

417 (Wilkins, C.J., concurring in part) ("[A]s states have abandoned the assumption of risk doctrine as part of the evolution of comparative negligence, so too have courts ceased to rely on assumption of risk as a foundation for their professional rescuer rule."); *cf. Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 209-10 (Tex. 2015) ("[T]he common law affirmative defenses of assumption of the risk and contributory negligence no longer exist under Texas law."); *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 772 (Tex. 2010) ("A plaintiff's appreciation of and voluntary exposure to a dangerous on-premises risk is something the jury can weigh when apportioning responsibility[.]").

[87] In 1943, we referenced the firefighter's rule but did not apply it.  *See Tex. Cities Gas Co. v. Dickens*, 168 S.W.2d 208, 211 (Tex. 1943) (noting that the defendant "relies upon the rule that, in the absence of any statutory provision to the contrary, a member of a fire department, who enters a building in the exercise of his duties, is a mere licensee, under a permission to enter given by the law, and the owner or occupant of the building owes him no duty to keep it in a reasonably safe condition").  And a few of our courts of appeals have applied or discussed the rule.  *See Thomas v. CNC Invs., L.L.P.*, 234 S.W.3d 111, 123 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Allen v. Albright*, 43 S.W.3d 643, 647 (Tex. App.—Texarkana 2001, no pet.); *Campus Mgmt., Inc. v. Kimball*, 991 S.W.2d 948, 952-53 (Tex. App.—Fort Worth 1999, pet. denied); *Airington v. Juhl*, 883 S.W.2d 286, 291 (Tex. App.—El Paso 1994), *rev'd*, 936 S.W.2d 640 (Tex. 1996); *Peters v. Detsco, Inc.*, 820 S.W.2d 38, 40 (Tex. App.—Houston [14th Dist.] 1991, writ denied); *Hous. Belt & Terminal Ry. Co. v. O'Leary*, 136 S.W. 601, 605 (Tex. Civ. App.—Galveston 1911, writ denied).

[88] 936 S.W.2d 640, 641 (Tex. 1996).

[89] *Id.* at 645-47 (Gonzalez, J., concurring).

29

aligning our jurisprudence on this issue with the majority of jurisdictions.[90]

Before addressing the public-policy considerations, we note that the question here is *not* whether to recognize a *new* duty.[91] Rather, we are asked to adopt a categorical rule *restricting* the legal duties owed to a specific class of persons—responding public-safety officers—under certain circumstances. The *Restatement (Third) of Torts* advocates such an approach: "In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that

---

[90] *See Apodaca*, 392 P.3d at 537 ("More than 30 jurisdictions in the United States have adopted the firefighter's rule[.]"); RESTATEMENT (THIRD) OF TORTS: MISCELLANEOUS PROVISIONS § 5_0 reporters' note cmt. b (noting that "approximately 35 states" have adopted the rule). Some jurisdictions have also codified or modified the rule by statute. *See, e.g.*, CAL. CIV. CODE § 1714.9; N.H. REV. STAT. § 507:8-h. Although most jurisdictions have adopted the rule, a minority has not. *See Sepega*, 167 A.3d at 929 ("In total, eighteen states have abolished the firefighter's rule, severely limited its application, or have not addressed it at all."). A few states have limited or abolished the common-law rule by legislative action. *See* FLA. STAT. § 112.182; ILL. COMP. STAT. ch. 425 25/9f; MICH. COMP. LAWS § 600.2965; MINN. STAT. § 604.06; N.J. STAT. § 2A:62A-21; N.Y. GEN. OBLIG. L. § 11-106; VA. CODE § 8.01-226. High courts in at least two jurisdictions have rejected the rule. *Trousdell v. Cannon*, 572 S.E.2d 264, 266 (S.C. 2002); *Christensen v. Murphy*, 678 P.2d 1210, 1217 (Or. 1984). Around ten states have not addressed the rule. *See Apodaca*, 392 P.3d at 538. As the Supreme Court of Utah has noted, however, "Most of the handful of jurisdictions rejecting or significantly limiting the . . . rule have done so, at least in part, because of its association with the discredited assumption of the risk doctrine." *Fordham*, 171 P.3d at 414; *see supra* note 86.

[91] *See HNMC, Inc. v. Chan*, 683 S.W.3d 373, 380 (Tex. 2024) ("[C]ourts should only consider recognizing a new duty '[w]hen a duty has not been recognized in particular circumstances.'" (quoting *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017))).

30

the ordinary duty of reasonable care requires modification."[92]  As the *Restatement* notes, this "rubric of duty" may be used "to decide whether an otherwise negligent actor should be liable to a class of persons in a certain relationship."[93]  But the propriety of doing so depends on whether "relatively clear, categorical, bright-line rules of law applicable to a general class of cases" can be delineated.[94]  We likewise have acknowledged that both "the relationship between the parties" and "public policy considerations" implicate the existence and parameters of a legal duty.[95]

In considering this broad, policy-laden question of duty, we hold that public policy supports a public-safety officer's rule in Texas.  Of the many rationales offered by courts and scholars, we find three especially compelling.  First, the rule encourages the public to promptly call for assistance from public-safety officers when needed, without hesitation

---

[92] RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 7(b) (AM. L. INST. 2010); *see id.* § 7 cmt. a (noting that in "some categories of cases, reasons of principle or policy dictate that liability should not be imposed" and "courts use the rubric of duty to apply general categorical rules withholding liability").

[93] *Id.* § 7 cmt. e (identifying the firefighter's rule as an example), reporters' note cmt. e (noting that when the firefighter's rule is "based on a considerable variety of public-policy considerations," "the rule is an example of the no-duty reasoning referred to in this Section").

[94] *Id.* § 7 cmt. a.

[95] *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 34 (Tex. 2002); *see Allen Keller Co. v. Foreman*, 343 S.W.3d 420, 424 n.4 (Tex. 2011) (recognizing the "distinction between broad, policy-laden questions of duty" to be decided by courts as a matter of law and the "more particularized scope-of-liability inquiries such as proximate cause").

or fear of liability.[96] These officers have the training, skill, and expertise to deal with the risks associated with providing such assistance as well as a unique and a special relationship with the members of the public that call on them to confront perils as part of their official responsibilities.[97] Second, the rule promotes public trust by minimizing (i) "the specter of invidious discrimination" that an officer may be "more willing to risk injury when prospects for a tort recovery are promising," (ii) doubt about the integrity of police and fire investigations when a negligence lawsuit from an investigator's fellow officer may be forthcoming or pending, and (iii) cynicism when officers come to the public's aid but then sue those whom they served for ordinary acts of

---

[96] *See, e.g.*, *Fordham v. Oldroyd*, 171 P.3d 411, 413 (Utah 2007) (pointing out that it would be "naïve" to believe that public-safety officers will be called on to address only "prudent acts gone awry" and "[m]embers of the public, who owing to their negligence find themselves in need of aid, should summon assistance without fear of exposing their assets to compensate their rescuer in the event of injury"); *Shypulski v. Waldorf Paper Prods. Co.*, 45 N.W.2d 549, 551 (Minn. 1951) ("An owner, facing knowledge that he risks being mulcted in damages by those whom he summons to aid in the extinguishment of a fire, would be strongly tempted by self-interest to temporize with the dangerous situation, to adopt his own means of saving his property, and to delay summoning aid until perhaps greater danger would be threatened to the public." (quoting *Suttie v. Sun Oil Co.*, 15 Pa. D. & C. 3, 5-6 (Ct. Com. Pl. 1931))); Robert H. Heidt, *When Plaintiffs Are Premium Planners for Their Injuries: A Fresh Look at the Fireman's Rule*, 82 IND. L.J. 745, 783-84 (2007) (noting that the rule sends the message "[s]ummon the professional rescuers at once!" while fear of liability in the absence of the rule may lead a business "to delay calling the professionals in the hope that its employees—the preferred firefighters—can deal with the fire" and that this "offends the interest of society" as the employer and its employees "may overestimate their relative competence to deal with the peril compared to the professionals").

[97] *See Thomas v. CNC Invs., L.L.P.*, 234 S.W.3d 111, 120 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (noting that the rule's purpose is to encourage citizens to rely on "the skill, training, and expertise of these public servants").

negligence.[98]   Finally, as Justice Gonzalez noted, "the risk and cost of injuries to officers are more effectively spread by passing them on to the public as a whole through the government entities that employ them"— for example, through workers' compensation—"rather than by making an individual pay for the injury."[99]   That said, as a society, we collectively owe a significant debt to public-safety officers who confront perils as part of their callings, and "responsible citizens can, and should, see to it that their public officials fairly compensate" those officers.[100]

---

[98] Heidt, *supra* note 96, at 747, 772-74, 776; *see Fordham*, 171 P.3d at 414 (recognizing that the public's expectations would be upset if the law were contrary to the "widely held belief that one is not exposed to tort liability for negligence requiring rescue[, which] emanates from a broadly shared value about the workings of a well-ordered society").   Heidt also discussed a "reciprocity rationale," which deems the rule a fair and "appropriate counterpart" to the immunity "that prevents crime victims and home and business owners from maintaining a suit against [public-safety officers] whose negligence injures them."   Heidt, *supra* note 96, at 762.   This rationale is perhaps particularly conspicuous in this case.   *See supra* part III.A.

[99] *Juhl v. Airington*, 936 S.W.2d 640, 647 (Tex. 1996) (Gonzalez, J., concurring) (citing TEX. LAB. CODE §§ 401.001–418.002); *accord Fordham*, 171 P.3d at 416 ("The nature of the rescuer–rescued relationship is one that contemplates allocation of costs across society generally for injuries sustained by professional rescuers."); *Pottebaum v. Hinds*, 347 N.W.2d 642, 645-46 (Iowa 1984) ("[A]lthough we are aware of the widespread existence of liability insurance, we believe these risks are more effectively and fairly spread by passing them onto the public through the government entities that employ firefighters and police officers."); *cf.* Heidt, *supra* note 96, at 789 (arguing that first-party insurers "are better able to estimate the likelihood of a professional rescuer being injured on the job" and "the likely severity of such injuries" than "the defendant's liability insurer is able to estimate the likelihood of its insured negligently causing a peril that leads to a rescuer's injury," particularly given the unpredictable nature of tort awards).

[100] *Fordham*, 171 P.3d at 416.

But these policy considerations do not support a sweeping rule extinguishing all potential liability. We must therefore decide what formulation to adopt. In canvassing the various permutations across jurisdictions, we conclude that a recent tentative draft from the *Restatement (Third) of Torts* articulates the rule in a manner consistent with public policy and the narrow approach taken by most states. Drawing on that version, we adopt the following rule:

> An actor who innocently or negligently creates a peril that occasions the presence of a public-safety officer owes no duty to that officer when the officer is injured by the very same peril that occasioned the officer's presence, and the officer is injured while (1) on duty, (2) acting within the scope of employment, and (3) engaged in the performance of emergency activities.[101]

In doing so, we emphasize both the rule's circumscribed nature and the other duties that may be owed to a responding officer. Among other constraints, the rule does not (1) absolve conduct more culpable than negligence, (2) shield tortious conduct that is independent of or distinct

---

[101] *See* RESTATEMENT (THIRD) OF TORTS: MISCELLANEOUS PROVISIONS § 5_0 (AM. L. INST., Tentative Draft No. 3, 2024). Instead of "public-safety officer," the *Restatement* draft uses "professional rescuer," albeit limited to "publicly employed professionals," in reference to the rule's converse "rescue doctrine." *Id.* § 5_0 cmts. a, d (recognizing that the rule "deviates sharply from general tort principles, which hold, and have long held, that a party who attempts a rescue and is injured thereby may recover from the actor whose tortious conduct made the rescue necessary"). However, we have not addressed whether the "rescue doctrine" survived the adoption of comparative negligence in Texas and, if so, what form it would take. *See Snellenberger v. Rodriguez*, 760 S.W.2d 237, 237 (Tex. 1988) (acknowledging the rescue doctrine but noting that the "doctrine came into being before the adoption of comparative negligence in order to relieve the all or nothing effects of contributory negligence"). And in our view, the term "public-safety officer" better captures the rule's public-employment requirement and basis in public policy.

from the conduct that occasioned the public-safety officer's presence, or (3) apply to tortious conduct that occurs after the officer arrives at the scene, including the violation of any duty to warn the officer.[102]

This case raises the question of a premises owner's or occupier's duty to warn when the rule applies. In accord with the rule's history and supporting policies, we hold that the duty owed is no greater than that owed to a licensee: to use ordinary care to warn of a dangerous condition of which the owner or occupier is aware and the officer is not.[103]

---

[102] RESTATEMENT (THIRD) OF TORTS: MISCELLANEOUS PROVISIONS § 5_0 cmts. h–i, illus. 10, & reporters' note cmt. i; *see Babes Showclub, Jaba, Inc. v. Lair*, 918 N.E.2d 308, 314 (Ind. 2009) ("[T]he automobile driver who negligently causes an accident can call paramedics without fear that they will sue him for causing the accident, but he must behave reasonably once they arrive."). This approach is also consistent with our case law that a property owner or occupier would be liable for "any act of negligence" after a firefighter "was at the scene of the fire in the performance of a duty." *Hous. Belt & Terminal Ry. Co. v. Johansen*, 179 S.W. 853, 854 (Tex. 1915) (applying a continuing-negligence theory); *cf. Burton Constr. & Shipbuilding Co. v. Broussard*, 273 S.W.2d 598, 602 (Tex. 1954) (noting that a proprietor has a duty not to injure someone rightfully on the property, even as a licensee, through active negligence); *Tex. Cities Gas Co. v. Dickens*, 168 S.W.2d 208, 211 (Tex. 1943) (holding that a gas company had a duty to cut off the gas going into a burning building when the fireman was "at the scene of the fire, performing his duties as a fireman"); *Campus Mgmt., Inc. v. Kimball*, 991 S.W.2d 948, 951 (Tex. App.—Fort Worth 1999, pet. denied) (noting that "Texas courts have not referred to active negligence . . . since the *Texas Cities* case" and that "[a]ssuming the active negligence doctrine is still viable with regard to fire fighters, the active negligence must have occurred *after* the fire fighter arrived on the scene to combat the blaze, not before").

[103] *Accord Apodaca v. Willmore*, 392 P.3d 529, 542 (Kan. 2017) (noting that the initial tortfeasor still has a duty to warn of known, hidden dangers); *Baldonado v. El Paso Nat. Gas Co.*, 176 P.3d 277, 281 (N.M. 2007) (same); *Clark v. Corby*, 249 N.W.2d 567, 570 & n.8 (Wis. 1977) (collecting cases); *Shypulski v. Waldorf Paper Prods. Co.*, 45 N.W.2d 549, 553 (Minn. 1951) (noting that a property owner with knowledge of dangers should not be allowed

For that duty to be triggered, however, the premises owner or occupier must have had a reasonable opportunity under the circumstances, which would encompass the nature and exigency of the emergency situation, to warn the responding officer of the hidden danger.[104]

**2.**

Having adopted a public-safety officer's rule, we now consider whether it applies to the plaintiffs' claims against Home Depot.[105]  The

"to stand by in silence" when the "burden of a duty to warn of hidden perils falls lightly upon the landowner in comparison with the cost of his silence, which is frequently measured in the lives and limbs of firemen and in the sorrow and suffering of their families"); *Allen v. Albright*, 43 S.W.3d 643, 647 (Tex. App.—Texarkana 2001, no pet.) ("In cases involving firefighters, Texas courts have applied the duties owed to an ordinary licensee, including the duty to warn of known, dangerous conditions."); *see also Cath. Diocese of El Paso v. Porter*, 622 S.W.3d 824, 832 (Tex. 2021) (describing the duty to warn owed to a licensee); *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) ("If the licensee has the same knowledge about the dangerous condition as the licensor, then no duty to the licensee exists.").

[104] *Accord Apodaca*, 392 P.3d at 544 ("[T]he person must have had knowledge of the danger and an opportunity to warn of it."); *Syracuse Rural Fire Dist. v. Pletan*, 577 N.W.2d 527, 534 (Neb. 1998) (holding that the duty to warn is dependent upon an awareness of the firefighters' presence on the property and an opportunity to warn); *Flowers v. Rock Creek Terrace Ltd. P'ship*, 520 A.2d 361, 369 (Md. 1987) ("Negligent acts not protected by the fireman's rule may include failure to warn the firemen of pre-existing hidden dangers where there was knowledge of the danger and an opportunity to warn."); *Clark*, 249 N.W.2d at 570 (requiring a "clear opportunity" to warn). For example, given the exigency and stress of the situation, a person escaping a burning house may not have had a reasonable opportunity to warn a firefighter of hidden dangers, as a matter of law, even if the person passed the firefighter rushing to the house.

[105] Home Depot framed the rule as applying to premises-liability claims, consistent with earlier decisions from our courts of appeals.  *See Juhl v. Airington*, 936 S.W.2d 640, 647 (Tex. 1996) (Gonzalez, J., concurring) (recognizing "that the Fireman's Rule has been employed in Texas only in

36

plaintiffs did not plead any culpability greater than negligence. And Home Depot's allegedly negligent conduct in detaining Juarez, along with other related conduct, created the peril that occasioned the officers' presence at the store and injured them.[106] The plaintiffs assert that the rule should not apply because the risks the officers encountered were not "inherent in responding to a call to assist an off-duty officer for a warrant check."[107] But officers are specifically trained and authorized to address the safety risk that a suspect might have a concealed weapon and respond violently. That risk is quintessentially inherent in their professional responsibilities, including when they assist in verifying a suspect's outstanding warrant for a possible arrest.

As to Santander and Almeida, all agree they were on duty and acting within the scope of their employment as police officers. But the plaintiffs claim the officers were not responding to an emergency

---

premises liability cases"); *supra* note 87. But we need not decide whether the plaintiffs' negligence claims were improperly pleaded premises-liability claims because the rule we adopt today applies to either type of claim.

[106] Whether Seward called for backup while performing his official duties or on Home Depot's behalf has no bearing on the rule's application. *See* RESTATEMENT (THIRD) OF TORTS: MISCELLANEOUS PROVISIONS § 5_0 cmt. i & illus. 11 ("[I]t is immaterial whether the actor summons emergency assistance or whether another individual makes the call."); *accord Norfolk S. Ry. Co. v. Johnson*, 554 S.W.3d 315, 318 (Ky. 2018) (rejecting the argument that the homeowner must be the one to call law enforcement).

[107] *See* RESTATEMENT (THIRD) OF TORTS: MISCELLANEOUS PROVISIONS § 5_0 cmt. j ("Consistent with the interpretation of most courts, this Section precludes liability only if the [public-safety officer] is injured by risks that are inherent in, or peculiar to, the [officer's] professional responsibilities."); *cf. id.* § 5_0 cmt. j, illus. 12 (noting that the rule does not apply when an officer responding to a negligently derailed train was injured by "exposure to the extremely rare toxic chemical" it was carrying unbeknownst to the officer).

because dispatch did not specifically inform them why their assistance was needed. We disagree with this cramped view of "emergency" for the purposes of this common-law rule. Santander and Almeida knew that an off-duty officer was requesting assistance and, according to Almeida's testimony, such requests usually involve criminal activity like theft. They also knew the suspect had a potential outstanding warrant. Their response was neither routine nor scheduled; rather, it was an intervention involving a warrant check of a potential criminal, which if confirmed would mandate an arrest—and they were injured when they attempted to make that arrest.[108] In short, the officers were engaged in the performance of emergency activities when they were injured.

For these reasons, the public-safety officer's rule applies to the plaintiffs' claims and restricts the duties Home Depot owed to the responding officers.[109] But the rule does not relieve Home Depot, as the

_____

[108] *See* RESTATEMENT (THIRD) OF TORTS: MISCELLANEOUS PROVISIONS § 5_0 cmt. g (noting that the rule does not apply when a public-safety officer is injured "performing a routine or scheduled, rather than an emergency, activity"); *accord, e.g.*, *Labrie v. Pace Membership Warehouse, Inc.*, 678 A.2d 867, 868 (R.I. 1996) ("In Rhode Island the rule has had a limited application to those situations (such as fighting fires or crimes in progress) in which a crisis or an emergency causes the hurried intervention of public-safety officers."). According to the police deparment's standard operating procedures, "[a]n arrest warrant commands that any sworn law enforcement or peace officer that comes in contact with the person named within the warrant shall arrest the offender[.]" DALL. POLICE DEP'T, *Standard Operating Procedure: Warrants* § 905(A) (2010).

[109] As another ground for a duty, the plaintiffs allege that Home Depot, by adopting asset-protection policies, undertook a duty to reasonably implement them. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000) ("One who undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person or things, is

38

premises occupier, of a duty to warn of known, dangerous conditions of which the responding officers are unaware.[110]  Home Depot's employee Painter patently had a reasonable opportunity to warn the officers.  The question is whether he had knowledge of a hidden, dangerous condition. We have described a dangerous condition as one "that presents an unreasonable risk of harm."[111]  A risk is unreasonable in this context when there is a "sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen."[112]  Agreeing with the plaintiffs, the court of

---

subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking" in certain circumstances. (quoting RESTATEMENT (SECOND) OF TORTS § 323 (AM. L. INST. 1965))); *see also Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) ("The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist.").  For support, the plaintiffs point to an internal Home Depot document that asset-protection associates "must discontinue an apprehension *if the subject is a safety risk* to the AP Associate, themselves *or others*; if the subject runs; has weapon." (Emphases added.)  But these policies generally address only the protection of "others"—broadly speaking, all visitors to the property—without being specifically directed towards responding officers.  In light of the public-safety officer's rule, we conclude that a retailer's adoption of general safety policies does not independently create a duty owed to a responding officer to act without negligence in creating an unsafe condition that necessitates the officer's intervention.

[110] The plaintiffs also imply that after the officers arrived at the scene, Painter acted negligently in saying yes "sarcastically" when Juarez asked whether he was going to jail.  But the plaintiffs identify no supporting authority, and we see no basis for concluding that Painter's truthful response, even if self-admittedly in a sarcastic tone, could raise a fact question that Painter breached a duty owed to the responding officers.

[111] *County of Cameron v. Brown*, 80 S.W.3d 549, 554 (Tex. 2002).

[112] *Id.* at 556 (internal quotation marks omitted).

39

appeals concluded that a reasonable factfinder could find that "detaining Juarez without having searched him constituted a dangerous condition known to Painter and unknown to Santander and Almeida."[113]

We disagree. Importantly, "a hidden danger for a [public-safety] officer may differ from that for an ordinary citizen."[114] For example, as the Maryland high court explained, "firemen must know of the risk that a fire may cause an elevator to malfunction," and "[a]n open elevator shaft concealed by the smoke of the fire is not a hidden danger in the sense of an unreasonable danger that a fireman could not anticipate upon attempting to perform his firefighting duties."[115] Therefore, according to that court, there is no duty to warn the firefighters "of potential malfunctions of the elevators in the event of a fire."[116]

In a more recent case, the Kansas high court addressed a situation where a police officer was responding to an accident after dispatch informed him that a pickup truck had flipped over and where on the highway it was located.[117] Although it was night with no illuminating highway lights, the truck driver had turned off the

---

[113] 700 S.W.3d 126, 157-58 (Tex. App.—Dallas 2023).

[114] *Apodaca v. Willmore*, 392 P.3d 529, 544 (Kan. 2017); *cf. Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) ("A licensee is not entitled to expect that the possessor [of land] will warn him of conditions that are perceptible to him, or the existence of which can be inferred from facts within his present or past knowledge." (quoting *Lower Neches Valley Auth. v. Murphy*, 536 S.W.2d 561, 564 (Tex. 1976))).

[115] *Flowers v. Rock Creek Terrace Ltd. P'ship*, 520 A.2d 361, 370-71 (Md. 1987).

[116] *Id.* at 370.

[117] *Apodaca*, 392 P.3d at 532.

40

headlights and left the overturned vehicle without turning on emergency flashers.[118] The responding officer crashed into the truck while traveling 104 miles per hour to arrive at the scene.[119] The officer argued that because it was not possible for him to see the pickup, the truck "was a known, hidden danger" for which there was a duty to warn.[120] But the court held that the officer was "fully informed" by the dispatcher identifying the accident location and that "the particular danger in this case, a truck blocking the road, was of the type a law enforcement officer responding to the scene of an accident should be able to anticipate, in a way that an ordinary citizen might not."[121]

Similar principles apply here. Before arriving, the responding officers had Juarez's name, saw a warrant for that name with an accompanying picture, and knew an off-duty officer was requesting assistance. When they arrived, they observed that Juarez was detained albeit unrestrained in the office. Although Painter testified he had not seen Juarez getting searched, there is no evidence that anyone knew Juarez had a concealed gun until he pulled it from his pocket and shot the officers and Painter. Nor do the plaintiffs allege that Painter made any misrepresentation on which the responding officers could rely to conclude that Juarez otherwise had been adequately searched. In such a scenario, a law-enforcement officer should anticipate in a way that an ordinary citizen might not that a suspect could have a concealed weapon.

---

[118] *Id.*

[119] *Id.*

[120] *Id.* at 544.

[121] *Id.*

41

In this context, we disagree that a fact issue exists that Painter had knowledge, and an accompanying duty to warn, of a dangerous condition of which the responding officers were unaware.

The plaintiffs point out that Painter knew Juarez had a can of mace and a blade on his body. But Painter also knew those items had been removed when the officers arrived. Although the removed items along with Juarez's suspicious behavior would provide *an officer* with reasonable suspicion to support a protective frisk, we cannot conclude that those facts alone would provide a member of the public like Painter with knowledge of a hidden, dangerous condition. At most, Painter might have had a suspicion Juarez had a concealed weapon. An ordinary citizen's mere suspicion, however, is not knowledge of a dangerous condition.[122]

The court of appeals erred in concluding that what, at most, would be Painter's suspicion raises a fact issue that he knew of a dangerous condition of which he was legally obligated to warn the responding officers. The case would be different if Painter had seen the gun before the officers arrived or made a misrepresentation as to the adequacy of any search. But on the evidence presented, the trial court properly granted summary judgment in Home Depot's favor.

---

[122] With the lucid view of hindsight, suspicions at the time of an event may later assume an air of knowledge. *Cf. Telthorster v. Tennell*, 92 S.W.3d 457, 463 (Tex. 2002) (in the official-immunity context, cautioning against viewing the facts "as they appear through the clarity of hindsight"). Long ago, Homer put it this way: "Once a thing has been done, [even] the fool sees it." *The Iliad and the Odyssey of Homer*, *in* 3 GREAT BOOKS OF THE WESTERN WORLD 206 (Mortimer J. Adler ed., Richmond Lattimore trans., 2d ed. 1990).

## IV. Conclusion

Police officers, as public-safety officers committed to protecting the common good even in the face of danger, deserve our admiration and appreciation. And the death or injury of an officer in the line of duty is always a tragic event. Undoubtedly, those who are accountable should be held responsible. Juarez has received a sentence of life without parole and faces civil liability for his horrific conduct. But the plaintiffs did not raise a fact issue that Seward, Home Depot, or Point 2 Point should be held legally responsible for the injuries resulting from Juarez's actions. We reverse the court of appeals' judgment and reinstate the trial court's judgment.

John P. Devine
Justice

**OPINION DELIVERED:** May 9, 2025

43